Edit Szanto (Bar No. 10587)
**BLUE LAKES LAW, PLLC**
155 2ND AVENUE N, SUITE 201
PO BOX 5126
TWIN FALLS, ID 83301
(t) 208.244.5200
(f) 208.907.0973
Edit.Szanto@bluelakeslaw.com

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **KAYLE COREY HOBBS** <br><br> Plaintiff, <br><br> vs. <br><br> **COLLEGE OF SOUTHERN IDAHO**; **ERIC ROGER NIELSON**, in his individual capacity; **TODD KEVIN SCHWARZ**, in his individual capacity; and **DAVID JEFFREY FOX**, in his individual capacity <br><br> Defendants. | **COMPLAINT FOR:** <br><br> 1) **VIOLATIONS OF THE FAIR LABOR STANDARDS ACT** <br> 2) **VIOLATIONS OF TITLE VII AND THE IDAHO HUMAN RIGHTS ACT** <br> 3) **VIOLATIONS OF TITLE IX** <br> 4) **VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 [EQUAL PROTECTION]** <br> 5) **VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §1983 [DUE PROCESS]** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Civil No. __1:20-cv-00269__ <br><br> Judge _____ |

Plaintiff KAYLE COREY HOBBS ("Mr. Hobbs"), by and through his attorney, hereby

complains against Defendants College of Southern Idaho ("CSI" or "the College"); Eric Roger

Nielson, Director of Human Resources and Title IX Coordinator of CSI ("Defendant Nielson");

Todd Kevin Schwarz, Executive Vice President and Chief Academic Officer of CSI ("Defendant

Schwarz"); and David Jeffrey Fox, President of CSI ("Defendant Fox"); as follows.

Mr. Hobbs was a dedicated employee of CSI for over 12 years. On or about December 13, 2019, CSI wrongfully terminated Mr. Hobbs after he reported misuse of college vehicle and poor performance by a female CSI maintenance worker who, faced with the possibility of losing her job, made allegations against Mr. Hobbs and another male employee. Based on those allegations, CSI conducted a biased investigation during which CSI consistently treated male employees more harshly than the female employee. CSI failed to adequately respond to Mr. Hobbs's "stalking" complaint against the female employee. Mr. Hobbs complained repeatedly of unequal treatment, biased disciplinary proceedings, and sex discrimination. CSI treated Mr. Hobbs's complaints with deliberate indifference, and ultimately fired Mr. Hobbs. CSI discriminated against Mr. Hobbs based on his sex in violation of federal and state laws and violated Mr. Hobbs's constitutional rights to equal protection and due process of law.

CSI misclassified Mr. Hobbs an exempt employee and stopped paying him overtime premium for all hours he worked in excess of 40 hours per workweek.

## NATURE OF THE CLAIMS

"Mr. Hobbs," a male maintenance worker, by and through his attorney, asserts claims against CSI and Defendants Nielson, Schwarz, and Fox (collectively "Defendants") as follows. For unpaid overtime compensation under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq*. ("FLSA"); for sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), Idaho Human Rights Act, Idaho Code § 67-5901, *et seq*. ("IHRA"), and Title IX of the Education Amendments of 1972, as amended, 42 U.S.C. § 1681, *et seq*. ("Title IX"); and for violations of Equal Protection and Due Process under the Fourteenth Amendment of the United States Constitution and under 42 U.S.C.

§ 1983 ("Section 1983"). Plaintiff seeks all available remedies including equitable relief, actual and compensatory damages, punitive damages, attorney's fees, costs, and interest. A trial by jury as to all issues triable to a jury in this matter is hereby demanded.

## II.    PARTIES

1.    Defendant CSI is a community college and a political subdivision of the State of Idaho, duly organized pursuant to state law, Idaho Code § 33-2101, *et seq.*

2.    Defendant Nielson is believed to reside in Twin Falls County, and at all times relevant hereto was Director of Human Resources and Title IX Coordinator at CSI. He is being sued in his individual capacity.

3.    Defendant Schwarz is believed to reside in Twin Falls County, and at all times relevant hereto was Executive Vice President and Chief Academic Officer at CSI. He is being sued in his individual capacity.

4.    Defendant Fox is believed to reside in Twin Falls County, and at all times relevant to the claims raised herein was President of CSI. He is being sued in his individual capacity.

5.    Plaintiff Hobbs is a resident of Twin Falls, Idaho, and had been Lead Project Coordinator in the Maintenance Department at CSI when he was wrongfully terminated in December 2019.

## III.    JURISDICTION AND VENUE

6.     This Complaint alleges causes of action under the laws of the United States, including the FLSA, Title VII, IHRA, Title IX, and the Constitution of the United States. This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law.

7.    This Court has supplemental jurisdiction over Plaintiff's state law claims under the provisions of 28 U.S.C. § 1367, which grants supplemental jurisdiction over claims that are part

of the same case or controversy as claims over which the Court has original jurisdiction.

8.      The Court has personal jurisdiction over defendants because CSI is a community college district located in Idaho, and Defendants Nielson, Schwarz, and Fox work and reside in Idaho.

9.      Venue is proper under 28 U.S.C. § 1391(b)(1) (district where parties reside) and (b)(2) (district in which a substantial part of the events or omissions giving rise to the claim occurred).

## IV.     ADMINISTRATIVE PROCEEDINGS

10.     Mr. Hobbs filed a Notice of Tort Claim with the Secretary of the CSI Board of Trustees ("Board") on January 10, 2020. The same day, an electronic copy was also sent to the Clerk of the Board, the Chairwoman of the Board, the Vice Chair of the Board, Defendant Nielson, Defendant Schwarz, and Defendant Fox via electronic mail.

11.     Mr. Hobbs filed a timely Charge of Discrimination with the Idaho Human Rights Commission ("IHRC") in January 2020, which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").

12.     On March 13, 2020, IHRC issued Mr. Hobbs a Notice of Right to Sue.

13.     On March 23, 2020, EEOC issued Mr. Hobbs a Notice of Right to Sue.

14.     Mr. Hobbs exhausted all internal administrative remedies available through CSI. On or about December 23, 2019, Mr. Hobbs appealed his termination internally to Defendant Schwarz. On February 4, 2020, Defendant Schwarz denied Mr. Hobbs's appeal. On or about February 6, 2020, Defendant Nielson confirmed in writing that the appeal decided by Defendant Schwarz was the final step, and there were no further appeals available.

15.     All administrative prerequisites have been met and this suit has been timely filed.

## V.     GENERAL ALLEGATIONS

16.     On or about April 17, 2007, CSI hired Mr. Hobbs as a Custodian.

17.     Mr. Hobbs worked for CSI for over 12 years.

18.     Over the years, Mr. Hobbs worked in the Maintenance Department in the following

positions: Custodian, Custodial Rover, Lead Custodian, and Lead Project Coordinator.

19.     Mr. Hobbs was a full-time regular non-probationary employee at CSI and had a written

employment contract with CSI.

20.     At all material times, Mr. Hobbs performed his duties satisfactorily.

21.     CSI wrongfully terminated Mr. Hobbs on or about December 13, 2019.

## FIRST CLAIM FOR RELIEF
**(Violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.*, against Defendant CSI)**

22.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if they were

set forth again herein.

23.     At all relevant times, CSI was Mr. Hobbs's employer. CSI is not exempt under the FSLA.

24.     At all relevant times, Mr. Hobbs was CSI's employee.

25.     CSI changed Mr. Hobbs's job title to Lead Project Coordinator effective July 1, 2016.

26.     Mr. Hobbs's change of employment form documented the change from nonexempt to

exempt status and the change in pay from $25,875 per year to $29,328 per year. The form

indicated that CSI "Re-classed Title and Grade to better match responsibilities."

27.     When CSI changed Mr. Hobbs's title from Lead Custodian to Lead Project Coordinator,

CSI changed Mr. Hobbs's classification from nonexempt to exempt, and stopped compensating

Mr. Hobbs for work performed in excess of 40 hours per workweek either by paying overtime

for the excess hours at a rate not less than one and one-half (1.5) times Mr. Hobbs's regular rate

of pay or with compensatory time off ("comp time") at a rate of one and-one-half (1.5) hours for

every hour worked in excess of 40 hours per workweek.

28. During the relevant three-year statutory period, Mr. Hobbs regularly worked over 40 hours per workweek and was entitled to overtime compensation (that is, one and one-half of his regular hourly rate) for every hour Mr. Hobbs worked in excess of 40 hours per workweek.

29. At all relevant times, CSI refused to pay overtime premium to Mr. Hobbs for all hours he worked in excess of 40 hours per workweek as mandated by the FLSA.

30. When Mr. Hobbs's title and pay were changed, CSI did not explain to Mr. Hobbs that it was changing his classification from nonexempt to exempt, and what that change meant.

31. Mr. Hobbs only found out that CSI no longer considered him eligible for comp time, when he submitted his first post-reclassification comp time slip, and CSI denied it. When he submitted his first post-reclassification timesheet for the weekend overtime he worked for the Rodeo program, and CSI failed to pay him one and one-half (1.5) times his regular rate of pay, Mr. Hobbs questioned it and was told that he was no longer eligible for overtime.

32. CSI's conduct was willful. CSI knew that its conduct was prohibited by the FLSA or showed reckless disregard for the matter of whether the conduct was prohibited by the FLSA.

33. CSI went against a reasonable interpretation of the statute and did not act in good faith.

34. Before CSI made its final decision and issued Mr. Hobbs's final paycheck, Mr. Hobbs complained repeatedly about CSI misclassifying him. CSI failed to properly address Mr. Hobbs's complaint.

35. CSI failed to address Mr. Hobbs's complaint before or after his termination.

36. CSI did not have reasonable grounds for believing that it was not violating FLSA.

37. Mr. Hobbs's written employment contracts specified his regular rate of pay, including his hourly rate. For contract year 07/01/2016 to 06/30/2017, Mr. Hobbs's pay was $29,328 per year or $14.10 per hour. For contract year 07/01/2017 to 06/30/2018, Mr. Hobbs's pay was $30,208

per year or $14.52 per hour.  For contract year 07/01/2018 to 06/30/2019, Mr. Hobbs's pay was

$31,114 per year or $14.96 per hour. For contract year 07/01/2019 to 06/30/2020, Mr. Hobbs's

pay for the Lead Project Coordinator position was $32,286 per year or $15.52 per hour.

38.    CSI employment contracts for exempt and nonexempt employees listed both a "contract

salary" per year and an hourly rate.

39.    Section 2.23 of the CSI Employee Policies and Procedures Manual (EXEMPT AND

NON-EXEMPT STATUS) stated: "An amendment in 2004 requires that an exemption to

overtime be predicated upon actual job function and not job title. Employees with job

descriptions that do not include managerial functions are considered non-exempt."

40.    According to the standards spelled out in Section 3.05 of the Employee Manual

(EXEMPT/NON-EXEMPT STATUS & OVERTIME), CSI employees who fall under the

executive, administrative, or professional exception "devote no more than 20% of their time to

non-exempt work."

41.    In the Lead Project Coordinator position, Mr. Hobbs's primary duties involved routine

physical or manual work such as moving furniture, arranging tables and chairs for special events,

preparing the gym for games, and collecting garbage from around campus. Mr. Hobbs's primary

duties did not change with the change in title, pay, and exempt status. Mr. Hobbs continued to

perform primarily nonexempt work and worked even more hours.

42.    Mr. Hobbs had very limited decision-making authority.

43.    Mr. Hobbs's primary duty did not involve office work directly related to management or

general business operations, such as: finance, budgeting, quality control, human resources, etc.

44.    Mr. Hobbs's primary duties were not predominately intellectual in character and did not

require the consistent exercise of discretion and judgment. Mr. Hobbs's primary duties were

repetitive, recurrent, or routine physical work.

45.    Mr. Hobbs was only engaged in the day-to-day carrying out of some functions of the Maintenance Department. Mr. Hobbs did not have the authority to formulate policies or procedures. Mr. Hobbs did not have the authority to negotiate and bind CSI contractually.

46.    Mr. Hobbs completed the work orders assigned to him. His primary duty did not include the exercise of discretion and independent judgment with respect to matters of significance.

47.    Although the work Mr. Hobbs performed was mostly routine, repetitive work, often what needed to be done and how exactly it needed to be done, was spelled out in the work orders.

48.    Mr. Hobbs received general directions from his supervisor and more detailed job-specific instructions from the department or office that submitted the work order and determined when the furniture or other items needed to be delivered, the shape and size of furniture needed, the exact location, how it needed to be set up, etc. Mr. Hobbs had one official supervisor but many people around campus who directed his work and inspected his work. When a work order that was out-of-the-ordinary came in, Mr. Hobbs had to first check with his supervisor and get permission prior to completing the job.

49.    When Mr. Hobbs's title was changed to Lead Project Coordinator, he was given what was described to Mr. Hobbs as a "crew of his own." The crew consisted of three maintenance employees. On or about October 2018, CSI transferred a fourth employee to the crew.

50.    At the time of his termination, Mr. Hobbs had four employees assigned to his crew: two Lead Custodians, a Maintenance Specialist, and a Custodian. Every crew member had specific responsibilities: one collected recycling, one delivered mail and food, one did custodial work and helped move furniture, and one helped to move furniture. The two employees that collected recycling and delivered mail and food needed minimal supervision or direction, as mostly they

COMPLAINT AND DEMAND FOR JURY TRIAL - 8

did the same thing every day. Mr. Hobbs did not regularly direct their work.

51.     Work orders to crew members were either assigned by the Administrative Assistant in the Maintenance Department or by Mr. Hobbs. Until the computer system changed, work orders to Mr. Hobbs were generally assigned by his supervisor or the Assistant Director of Physical Plant.

52.     Mr. Hobbs did not have authority to make hiring and firing decisions. He did not hire any of the employees assigned to his crew. His job duties did not include screening, interviewing, selecting, hiring, promoting, or terminating employees. Mr. Hobbs did not have the authority to set or adjust the crew members' rate of pay. These employees were hired by others prior to being transferred to Mr. Hobbs's crew by Mr. Hobbs's supervisor. Mr. Hobbs did not have the authority to suspend his crew members, put them on administrative leave, or to fire them.

53.     Mr. Hobbs did not have a budget. He bought items using the Maintenance Department's budget. He did not plan or control the budget.

54.     Mr. Hobbs's primary duty was not office or non-manual work. His primary duty involved manual, physical work. Typically, about 90% of Mr. Hobbs's regular workday was spent out "in the field" doing physical work.

55.     Most of the time, Mr. Hobbs completed his work orders on his own or with one of the crew members. Occasionally, he worked with two crew members to complete a work order.

56.     Most of the workweek, Mr. Hobbs did physical labor. Mr. Hobbs did not have an office or a desk in the Maintenance Department. He generally used the computer in the electrician shop to get some work done. The limited office or non-manual work Mr. Hobbs performed included doing routine paperwork and answering e-mails. Mr. Hobbs also used his personal cell phone to check work orders, answer calls, check and send e-mail messages.

57.     Although Mr. Hobbs had an associate degree in Liberal Arts at the time when his title

was changed to Lead Project Coordinator, the position only required a high school diploma or equivalent. Mr. Hobbs's primary job duties required him to be able to lift heavy objects, ability to operate equipment such as forklifts, and ability to drive light duty pickup trucks. Mr. Hobbs's primary job duties did not require substantial practical experience.

58.     At all relevant times, CSI did not require Mr. Hobbs to clock or sign in and out.

59.     At all times relevant, CSI failed to record, report, and/or preserve accurate time records of all hours worked by Mr. Hobbs.

60.     While Mr. Hobbs worked as a Lead Project Coordinator, Mr. Hobbs typically worked on work orders Monday through Friday from 6:30 a.m. to 3:30 p.m., and then he regularly answered phone calls and e-mails until 5:00 p.m. or later.

61.     Mr. Hobbs also used his personal cell phone to answer calls and e-mails after his shift was over. Some of his supervisors and office staff gave out his personal phone number, and Mr. Hobbs received phone calls in the evening, during weekends, and even while on vacation.

62.     The amount of work Mr. Hobbs had to get done was too much to accomplish during a regular 40-hour workweek. CSI placed limitations on payroll and exerted pressure to avoid or to keep the number of overtime and/or comp time hours for crew members to a minimum.

63.     Mr. Hobbs frequently did additional nonexempt work in excess of 40 hours in order to complete the work orders and get the job done.

64.     For example, after working at least 40 hours during the workweek, on Sunday September 16, 2018, Mr. Hobbs worked from about 5:30 p.m. to 8:30 p.m. to lay floor covering, set up stage pieces, lay carpet, put out trash cans, set up bleachers, and set up tables throughout the gym and other areas to help CSI get ready for the Hispanic Summit. The next day, Mr. Hobbs was already on campus at around 6:00 a.m. and worked until after 5:45 p.m. to put things away after the

Hispanic Summit. Mr. Hobbs worked through his lunch hour gathering trash from the gym. The rest of that workweek, Mr. Hobbs worked at least 40 hours. Then, on Saturday, September 22, Mr. Hobbs worked in the afternoon about two more hours to pick up any tables and trash left outside the Taylor building. Mr. Hobbs was not paid overtime and did not receive comp time.

65.    In addition to his more than full-time regular job, Mr. Hobbs also performed work for the CSI Rodeo program on some weekends after his 40 hour or more workweek. His primary duty there was to park the horse trailers. Until CSI changed Mr. Hobbs's classification from nonexempt to exempt, Mr. Hobbs was paid one and one-half (1.5) times his regular hourly rate for the hours he worked for the Rodeo program in excess of 40 hours per workweek he worked at his regular job. The hourly rate used to calculate this compensation was the regular hourly rate per Mr. Hobbs's employment contract times one and one-half (1.5). Mr. Hobbs filled out a timesheet each payroll period for the additional hours he worked for the Rodeo program.

66.    After CSI changed Mr. Hobbs's classification from nonexempt to exempt, CSI refused to pay Mr. Hobbs one and one-half (1.5) times his regular hourly rate for every hour he worked in excess of 40 hours per workweek to park horse trailers for the Rodeo program on weekends. For example, on March 10 and 11, 2017, Mr. Hobbs worked 13.5 hours for the Rodeo program in excess of the 40 hours per workweek he worked at his regular job and was paid only $190.35 based on his regular hourly rate which was $14.10 at the time. Mr. Hobbs was paid $190.35 for 13.5 hours of work instead of $285.53 at one and one-half (1.5) times his regular hourly rate.

67.    Additionally, CSI failed to completely relieve Mr. Hobbs from duty during unpaid meal periods. About 90% of Mr. Hobbs's lunches were interrupted, and Mr. Hobbs was back to work within about the first 30 minutes of his lunch.

68.    Additionally, on several occasions, Mr. Hobbs worked during the evenings or on

weekends on top of his more than 40-hour workweek without being paid overtime premium for every hour worked in excess of the 40 hours per workweek.

69.     Although CSI changed Mr. Hobbs's classification from nonexempt to exempt effective July 1, 2016, it was not until approximately eight months later, on or about February 25, 2017, when CSI paid out Mr. Hobbs's accrued comp time.

70.     Although CSI had actual or constructive knowledge that Mr. Hobbs regularly worked more than 40 hours per workweek, after CSI changed Mr. Hobbs's job title to Lead Project Coordinator and changed his classification from nonexempt to exempt, CSI failed to pay Mr. Hobbs overtime compensation at a rate not less than one and one-half (1.5) times his regular hourly rate for all hours worked in excess of 40 hours per workweek. Between July 1, 2016, and December 13, 2019, Mr. Hobbs was not paid overtime for all the hours he worked in excess of 40 hours per workweek at his regular full-time job in the Maintenance Department, and he was only paid based on his regular hourly rate, not one and one-half (1.5) times his regular hourly rate, when he worked for the Rodeo program on weekends in addition to the 40 hours or more per workweek he worked at his regular job. Nor did Mr. Hobbs receive comp time at one and one-half (1.5) hours for the hours he worked in excess of 40 hours per workweek.

71.     CSI's actions, policies, and/or practices as described above violate the FLSA. By engaging in the above-described conduct, CSI willfully violated the FLSA. CSI has not made a good-faith effort to comply with the FLSA with respect to properly compensating Mr. Hobbs. Because CSI's violations of the FLSA have been willful, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

72.     As a direct and proximate result of CSI's unlawful conduct, as set forth herein, Mr. Hobbs sustained damages, including loss of wages for hours of overtime worked in an

amount to be established at trial. Mr. Hobbs is entitled to compensatory damages in the amount

equal to all of the overtime wages CSI failed to pay to Mr. Hobbs for three years preceding the

filing of this Complaint, additional statutory liquidated damages pursuant to 29 U.S.C. § 216 (b)

in the amount equal to all of the unpaid overtime wages, pre-judgment and post-judgment

interest, and attorney's fees and costs, including expert fees and costs, and such other, further,

general and/or equitable relief to which Mr. Hobbs may be entitled.

**SECOND CLAIM FOR RELIEF**
**(Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964,**
**as amended, 42 U.S.C. § 2000e *et seq*., and**
**the Idaho Human Rights Act, I.C. § 67-5901, *et seq*., Against Defendant CSI)**

73.      Mr. Hobbs realleges and incorporates by reference all preceding paragraphs as if they

were set forth again herein.

74.      Mr. Hobbs is male.

75.      During his career spanning 12 years at CSI, Mr. Hobbs's immediate supervisors, whose

job was to supervise Mr. Hobbs, consistently rated is performance and conduct as "Exceeds

Expectations," including on the following criteria: "helps create and maintain a non-

discriminatory, harassment free, drug/alcohol free, and respectful workplace," "demonstrates

sounds judgment," "complies with College policies and other forms of guidance," "uses

acceptable processes (College policies and procedures, etc.) to bring issues to administration's

attention," "promotes and supports a respectful workplace," "demonstrates support and

compliance with general conditions of employment, EEO, security, and workplace safety

policies," "demonstrates ethical behaviors, sound decision-making skills, and compliance with

appropriate federal and state laws and College policies and procedures."

76.      Mr. Hobbs's personnel file did not contain any negative disciplinary information such as

a formal write-up, written warning, disciplinary notice, or reprimand.

77.    Mr. Hobbs met or exceeded the qualifications for the Lead Project Coordinator position, and he was performing his job satisfactorily.

78.    Mr. Hobbs's formal performance evaluations and his personnel file show that CSI considered him a good employee until a female maintenance worker, faced with the possibility of losing her job for misconduct and poor performance, made an allegation against Mr. Hobbs.

79.    CSI subjected Mr. Hobbs to adverse employment action when it terminated him.

80.    The decision to terminate Mr. Hobbs was based on his sex.

81.    At the time of his termination, Mr. Hobbs had four employees assigned to his "crew," including a female Lead Custodian and a male Custodian. CSI officially transferred the male Custodian to Mr. Hobbs's crew in October 2018.

82.    Mr. Hobbs had no significant authority to impact the terms and conditions of the employees assigned to his crew. Mr. Hobbs was not empowered by CSI to formally discipline or take adverse employment action against employees assigned to his crew. Mr. Hobbs did not have the authority to cut crew members' hours, to give crew members raises or to dock their pay, to change their benefits, to suspend them, to place them on administrative leave, to reassign them with significantly different responsibilities, to transfer them, to demote them, or to fire them. These powers were reserved to his supervisor and college administrators.

83.    CSI put Mr. Hobbs on forced leave on September 18, 2019, minutes after a meeting called to discuss concerns with the female Lead Custodian's job performance (e.g. not doing part of her job) and conduct (e.g. misuse of college vehicle). The meeting was held in the office of the Director of Physical Plant who was Mr. Hobbs's immediate supervisor, and the female Lead Custodian was called in to attend. Mr. Hobbs's supervisor decided to put the female Lead

Custodian on paid administrative leave. Faced with the possibility of losing her job for poor performance and misconduct, the female Lead Custodian made an allegation misconduct against Mr. Hobbs and the male Custodian. She alleged that sometimes in 2018, they touched her sexually without her consent.

84.     Mr. Hobbs emphatically denied her allegations and stated that he believed that she made those allegations in retaliation because "she was irate" when she was called into the director's office to discuss problems with her performance and conduct, and she knew that those types allegations would get Mr. Hobbs into trouble.

85.     When Mr. Hobbs was told about the specifics of the allegation, his response was: "Wow. That is a pretty serious accusation that did not happen." When the investigator asked him: "[T]his is not true then, what she said?" Mr. Hobbs responded" "I'm saying it's not true."

86.     The male Custodian also repeatedly denied any non-consensual touching.

87.     The female Lead Custodian had a prior consensual sexual relationship with Mr. Hobbs.

88.     Years prior to these events, the female Lead Custodian's wife asked Mr. Hobbs to be a sperm donor so she could have a child. Additionally, when Mr. Hobbs and his wife found out that they could not have children, they also discussed the Lead Custodian's wife becoming a surrogate and carrying a child for Mr. Hobbs and his wife. The consensual sexual relationship between the female Lead Custodian and Mr. Hobbs ended well before the alleged incident.

89.      The male Custodian stated that he was also asked to be a sperm donor, and that he also had a prior consensual sexual relationship with the female Lead Custodian and her wife.

90.     After she was faced with the possibly losing her job, the female Lead Custodian made the following allegation: sometimes in 2018, almost a year and a half prior to the meeting in question, while they were working in the Scott's building, and while the garage door was open,

the male Custodian put his hands up her shirt and rubbed up against her from the back while

Mr. Hobbs held her arms up above her head with one hand, tried to "make out" with her, and

tried to "stick his hands down the front of [her]." She alleged that she kept trying to get away and

that she was yelling, "Stop! Quit! I don't…Stop!"

91.     Based on those allegations, CSI commenced an investigation of "sexual assault" in

violation of Section 6.01 of the CSI Employee Manual (Unlawful Discrimination, Harassment,

Human Trafficking, Sexual Misconduct Policy and Complete Complaint Procedure).

92.     Based on Mr. Hobbs's report of poor job performance and misuse of college property,

Mr. Hobbs's supervisor initially placed the female Lead Custodian on paid administrative leave

until the matter could be investigated. However, after consulting with the Director of Campus

Safety, the Vice President of Student Services, and the Director of Human Resources (Defendant

Nielson), Mr. Hobbs's supervisor called the female Lead Custodian back to work and called

Mr. Hobbs and the male Custodian and placed both of them on administrative leave over the

phone. The female employee's administrative leave lasted only part of the morning.

93.     Five days later, on September 23, 2019, CSI dispatched the Lead Campus Safety Officer

in a campus security car to Mr. Hobbs's home to hand-deliver a written NOTICE OF

PROPOSED PERSONNEL ACTION—NOTICE OF ADMINISTRATIVE LEAVE WITH PAY

PENDING DECISION (Notice 1) to Mr. Hobbs.

94.     Notice 1 was signed by Defendant Nielson.

95.     Although no investigation of the allegations against Mr. Hobbs had been conducted yet,

Defendant Nielson already stated the following in Notice 1:

> The information under investigation relates to your acts or omissions, including
> but not limited to allegations that you have violated the College of Southern
> Idaho campus policy 6.01 Unlawful discrimination, Harassment, Human
> Trafficking, and Sexual Misconduct.

COMPLAINT AND DEMAND FOR JURY TRIAL - 16

Based on the foregoing it appears to me that your acts or omissions with regard to the matters referred to in the foregoing documentation is not in the best interest of the College of Southern Idaho.

96.    There was no other information or documentation about the specific allegations against Mr. Hobbs included in Notice 1 or attached to it.

97.    Defendant Nielson directed Mr. Hobbs to immediately surrender:

[A]ll identification cards, or any items that identify you as an employee of the College of Southern Idaho along with any and all keys which you have to any and all College of Southern Idaho automobiles, buildings or facility of any nature.

98.    The security officer gathered those items from Mr. Hobbs at that time.

99.    Mr. Hobbs was directed in Notice 1 by Defendant Nielson that during the period of his administrative leave he was not authorized to be present "in any of the offices of any College of Southern Idaho facility, which are not accessible to any other members of the general public, without express written permission from Eric Nielson."

100.    Section 6.08 (KEYS) required employees to return keys upon termination:

It is the policy of the College to allow the faculty and staff all freedom of movement about the campus consistent with reasonable security of public and personal property…Upon termination of employment, keys must be returned to the Maintenance or HR Departments.

101.    In the same notice, Defendant Nielson also threatened Mr. Hobbs with criminal charges for any violation of Defendant Nielson's directives.

102.    Defendant Nielson sent a similar notice to the male Custodian, in similar manner.

103.    CSI treated Mr. Hobbs and male Custodian as if they were being fired as soon as the female Lead Custodian made her allegations against them, but before CSI investigated her allegations. It showed a presumption that the allegations of the female employee were true, and that the male employees were responsible for misconduct.

COMPLAINT AND DEMAND FOR JURY TRIAL - 17

104.    The investigation that followed was biased against the male employees.

105.    During the investigation, the female Lead Custodian made additional allegations, and both Mr. Hobbs and the male Custodian made allegations against her.

106.    Mr. Hobbs repeatedly asked CSI to investigate his "stalking" complaint against the female Lead Custodian. "Stalking" was an offense under Section 6.01, the same policy Mr. Hobbs and the male Custodian were accused of violating. The term "stalking" was defined in Section 6.01. Mr. Hobbs provided GPS data that showed that she repeatedly drove by and parked near his home in the early morning hours using the college vehicle.

107.    The male Custodian alleged that the female Lead Custodian "grabbed his crotch," "slapped his ass," unbuttoned her pants and opened them up in front of them and said "if you want some, stick your hand in," and when the male Custodian was house sitting for Mr. Hobbs, the female Lead Custodian told him: "Well if you would have been up at 4 o'clock this morning when I drove by and was horny and the lights would have been on, then I would have stopped."

108.    CSI failed to adequately respond to Mr. Hobbs's "stalking" complaint. CSI also failed to investigate the male Custodian's allegations against the female Lead Custodian.

109.    At the conclusion of the biased investigation into the female Lead Custodian's allegations, Defendant Nielson sent a NOTICE OF PROPOSED PERSONNEL ACTION—TERMINATION OF EMPLOYMENT (Notice 2) dated Friday October 11, 2019, to Mr. Hobbs.

110.    In Notice 2, CSI accused Mr. Hobbs of five alleged violations of various provisions of the CSI Employee Manual, specifically:

     a.   Two violations of Section 6.01 (Unlawful Discrimination, Harassment, Human Trafficking, Sexual Misconduct Policy & Complete Complaint Procedure): 1) Sexual assault; and 2) Failure to report a violation of Section 6.01 by subordinates

(inappropriate sexual and other contact between subordinates)

    b.  Two violations of Section 6.03 (Drug-Free & Alcohol-Free Campus Policy & Alcohol Testing Policy and Procedures): 1) Failure to report and follow process pertaining to Section 6.03 by allowing subordinate to continue to work while knowing he was under the influence of medication; and 2) Failure to report and follow process pertaining to Section 6.03 by not taking action after being informed that subordinate was intoxicated at work

    c.  One violation of Section 2.05 (Consensual Relationship Policy): Failure to report and follow process pertaining to 2.05 Consensual Relationship Policy by having a sexual relationship with a subordinate and did not report properly.

111.    Mr. Hobbs denied all the policy and procedure violations he was accused of.

112.    CSI accused Mr. Hobbs of violating non-existent provisions of the Employee Manual.

113.    CSI accused Mr. Hobbs of "sexual assault" without defining "sexual assault" and without defining "consent" in Section 6.01 of the Employee Manual.

114.    Based on the actual language of the policies and procedures, CSI was unable to show that Mr. Hobbs violated those specific provisions of the CSI Employee Manual.

115.    The reasons provided by CSI for Mr. Hobbs's termination changed multiple times, and CSI gave conflicting, contradictory, and inconsistent reasons for Mr. Hobbs's termination.

116.    First, CSI "rescinded" its finding that Mr. Hobbs violated CSI's consensual relationship policy (Section 2.05). CSI did not accuse the female Lead Custodian of failing to report her past consensual sexual relationship with Mr. Hobbs.

117.    Then, CSI admitted that Mr. Hobbs did not violate Section 6.03. Nevertheless, CSI kept both alleged violations in Mr. Hobbs's final termination letter, just tweaked the wording

somewhat as it could not show that Mr. Hobbs violated the policy he was accused of violating.

118.    The actual language of Section 6.03 did not require Mr. Hobbs to report his suspicion that the male Custodian occasionally may have been impacted by the prescription medication prescribed for him by his Veterans Affairs ("VA") doctor.

119.    Section 6.03 applied to all employees and did not include specific reporting procedures for supervisors or coworkers to follow if they suspected that an employee was impacted by lawfully prescribed medication.

120.    Section 6.03 stated:

> Employees will not be permitted to work with a detectable level of prohibited drugs in their system. The basis for determining "under the influence" and/or "detectable level" is, for the purposes of this policy, a positive test result for drugs and/or alcohol. A positive result for alcohol shall be .02 alcohol concentration or more. Prohibited drugs include both illegal and legal substances, including alcohol or prescription drugs that have not been specifically prescribed, or used as prescribed, by a licensed physician for specific treatment purposes of the employee at that time.

121.    The prescription drugs taken by the male Custodian were not prohibited drugs according the CSI policy. There was no evidence that they were not specifically prescribed by a licensed physician or that they were not used as prescribed.

122.    Mr. Hobbs did not permit the male Custodian to work with a detectable level of prohibited drugs in his system. Even during the incident when he suspected that the male Custodian might have been impacted by his prescription medications, Mr. Hobbs showed care and concern for the male Custodian's safety when he put him in a room to sleep it off instead of driving home. At the time, the male Custodian was still reporting to the Custodial Supervisor.

123.    CSI did not include in the male Custodian's final termination letter a determination that he had violated Section 6.03 by reporting to work while impacted by his prescription medication.

124.    Importantly, CSI did not accuse the female Lead Custodian of allowing the male

Custodian to continue to work "while knowing he was under the influence of medication," and CSI also did not accuse her of not reporting. She was there. She was a Lead Custodian, while the male employee was only a Custodian.

125.    Section 6.03 only required employees to report citations, violations, and convictions of criminal drug and alcohol statutes.

126.    The actual language of Section 6.03 did not require Mr. Hobbs to report that the female Lead Custodian allegedly told him on a Monday sometimes in 2018 that she thought that the male Custodian showed up to work intoxicated on the previous Saturday. Mr. Hobbs was not even in town that day.

127.    There was nothing in the language of Section 6.03 that required Mr. Hobbs to report or take any action based on this second-hand information two days after the fact.

128.    The male custodian denied being intoxicated. CSI did not include in the male Custodian's final termination letter a determination that he violated Section 6.03 by reporting to work under the influence of alcohol.

129.    When Mr. Hobbs was out, the female Lead Custodian was in charge of completing work orders involving moving furniture. The female Lead Custodian was the lead on that project.

130.    Section 6.03 defined "under the influence" of alcohol as a positive test result with .02 alcohol concentration or more.

131.    The female Lead Custodian failed to report her suspicions on that Saturday to trained supervisory personnel who could have determined whether there was reasonable suspicion to require the male Custodian to be tested for alcohol. Therefore, the male Custodian was never tested, and there was no evidence that he was indeed under the influence of alcohol.

132.    CSI accused Mr. Hobbs of violating non-existent provisions of its Employee Manual and

punished him for not reporting that someone allegedly told him sometimes in 2018 that she believed that someone else was intoxicated two days prior.

133.    CSI did not to punish the female employee who was the lead on the project that weekend for permitting the male Custodian to work while she believed he was intoxicated, and for not reporting it right away to trained supervisory personnel.

134.    CSI could not show that Mr. Hobbs violated Section 6.03 of the Employee Manual.

135.    After CSI terminated Mr. Hobbs and refused his request for an appeal pursuant to Section 6.03, CSI admitted that Mr. Hobbs did not violate Section 6.03, but still left the failure to report or take action finding in his final termination notice, just tweaked the language.

136.    In his January 24, 2020, e-mail correspondence, Defendant Nielson stated:

> CSI did not find that Mr. Hobbs violated Policy 6.03. Therefore, the procedures in Policy 6.03 do not apply to Mr. Hobbs. Rather, the finding was that Mr. Hobbs failed to take any action when it was reported to him that an employee was intoxicated at work. Although Mr. Hobbs' inaction was not a direct violation of Policy 6.03, it was inconsistent with CSI's commitment to providing a drug-free and alcohol-free educational environment, and its prohibition of the use of drugs or alcohol by employees in the workplace, as embodied in Policy 6.03.

137.    CSI continued to employ a female supervisor who worked in Defendant Schwarz's division who racked up multiple DUIs, including a felony DUI. Court records referenced her employment at CSI: "The defendant may drive directly to/from work & for employment duties at: College of Southern Idaho. The defendant may drive to his probation appointments as scheduled. The defendant may not consume alcohol or illegal substances."

138.    CSI accused Mr. Hobbs of violating Section 6.01 for allegedly failing to report a violation of Section 6.01 by subordinates (sexual and other contact between subordinates). However, the language of Section 6.01 did not require Mr. Hobbs to make a report.

139.    Mr. Hobbs stated that he witnessed the female Lead Custodian hugging the male

Custodian and the male Custodian hugging the female Lead Custodian, and on one occasion he saw the female Lead Custodian "go near [the male Custodian's] groin with a hug, wrap around hug… grabbing…reaching around…hands near the groin area."

140.    Although CSI called the conduct Mr. Hobbs observed a violation of Section 6.01, CSI did not put the female Lead Custodian on forced leave pending investigation.

141.    In Notice 2, CSI also accused Mr. Hobbs of "sexual assault" in violation of Section 6.01. In its final termination letter sent on December 13, 2019 (Notice 3), CSI added the "nonconsensual sexual contact" to the heading.

142.    CSI failed to define "sexual assault" and failed to define "consent" in Section 6.01. These definitions were indispensable for finding Mr. Hobbs responsible for "sexual assault" in violation of Section 6.01.

143.    Without definitions, CSI could not apply objective criteria in determining whether employees violated Section 6.01 or not.

144.    CSI also failed to state the standard of evidence to be used in investigations of alleged violations of Section 6.01 or any other section or the Employee Manual.

145.    CSI never adopted the "affirmative consent" doctrine in Section 6.01.

146.    CSI never adopted the "preponderance of evidence" standard in Section 6.01.

147.    Nevertheless, CSI found, by a preponderance of the evidence, Mr. Hobbs responsible for "sexual assault" in violation of Section 6.01.

148.    CSI investigators and decisionmakers showed bias against the male employees, and allowed gender-based stereotypes, as they relate to allegations of sexual misconduct, to influence their decisions and actions.

149.    Without definitions, CSI used different definitions for "sexual assault" and "consent"

depending on the sex of the employees involved.

150.    CSI applied a strict definition of "affirmative consent" against the male employees.

151.    During the male Custodian's interview, one of the investigators said this about "consent:"

> Just in regards to consent, consent can be taken back, not just because you had a relationship. I am not saying this is what occurred, but anything in any situation consent must be asked. You can't just assume that it was consensual.

152.    This definition of consent required the male Custodian to "ask" for consent in any situation (verbal communication).

153.    On the other hand, CSI did not apply the same strict "affirmative consent" definition to allegations against the female Lead Custodian. The female Lead Custodian was accused by the male Custodian of "grabbing his crotch" and "slapping his ass." CSI did not require that the female employee ask for consent before grabbing or slapping, and CSI did not accuse her of "sexual assault" for assuming that the grabbing and slapping were consensual.

154.    CSI not only applied a definition of "consent" against the male employees that it did not adopt in Section 6.01, but it also applied one definition of "consent" against the male employees and another, much more lenient definition, against the female employee.

155.    Although Section 6.01 provides for an equitable method for the administrative resolution of complaints, without coercion and restraint, one of the investigators used coercive techniques.

156.    While investigators were offering tissue and support services to the female employee, on multiple occasions, one of the investigators "ordered" the male Custodian around, including "ordering" him not to talk to Mr. Hobbs.

157.    The decision to "order" the male Custodian to answer questions was made after consultation with Defendant Nielson who was one of the decisionmakers.

158.    The language, tone, and manner of interviews showed bias against the male employees

and gender-based stereotypes that revealed gendered assumptions.

159.    For example, investigators told the female Lead Custodian: "We need to talk about exactly what they did to you." They asked her: "Do you know of any other people who were victimized by them?" They referred to the alleged incident as "assault."

160.    The female Lead Custodian accused of "stalking" and other misconduct was not ordered around and investigators did not use accusatory language describing her alleged conduct. They did not ask the male employees whether they knew anyone else who was "victimized" by her, did not ask them to describe what she did to them, and did not refer to her alleged grabbing and slapping as "assault."

161.    The female Lead Custodian had motive to make those allegations.

162.    Investigators and decisionmakers ignored the many inconsistencies, contradictions, and inaccuracies in the female Lead Custodian's statements.

163.    There were no independent witnesses to the alleged "sexual assault," no security camera footage, no text messages, only her self-serving uncorroborated testimony.

164.    Throughout the investigation and decision-making process, CSI investigators and decisionmakers demonstrated a predisposition to believe the allegations made by the female employee and to disbelieve the male employees.

165.    CSI subjected Mr. Hobbs and the male Custodian to gender-biased disciplinary proceedings.

166.    Since based on the actual language of the policies, CSI could not show that Mr. Hobbs violated the policies and procedures CSI accused him of violating, after CSI terminated Mr. Hobbs, CSI came up with alternative reasons for Mr. Hobbs's termination.

167.    Defendant Schwarz accused Mr. Hobbs of "poor judgment" and breach of contract based

on "unprofessional" and "unbusinesslike" conduct, " including "inappropriate physical contact of a sexual nature (e.g. "ass slapping" and "grab ass"), "consensual but unprofessional physical contact," and "tacit approval of observed unprofessional behaviors of coworkers and subordinates, including sexual misconduct and sleeping off the effects of a controlled substance."

168.    Mr. Hobbs denied slapping the female Lead Custodian's buttocks. Mr. Hobbs was not even accused of "grab ass," only the male Custodian was.

169.    What constitutes "unprofessional behavior" and "poor judgment" are highly subjective. CSI did not have a specific definition of "unprofessional" or "unbusinesslike" conduct in the Employee Manual besides the conduct specifically proscribed in the manual.

170.    While Mr. Hobbs denies being unprofessional, he was hard-working and expected others to also do their jobs regardless of present or past personal relationships he had with them.

171.    Under these highly subjective standards, CSI once again failed to treat male and female employees equitably.

172.    Although CSI determined that Mr. Hobbs was "unprofessional" for "tacitly approving" observed "unprofessional" conduct by his subordinates, including "sexual misconduct," and although the male Custodian accused the female Lead Custodian of "grabbing his crotch" and "slapping his ass," and Mr. Hobbs accused her of "stalking," CSI failed to promptly put the female Lead Custodian on forced leave pending of an investigation into alleged "sexual assault" and "stalking" in violation of Section 6.01 or alleged "unprofessional" and "unbusinesslike" behavior. Before an investigation took place, CSI did not forbid her from being present in areas of campus not open to the general public and did not send a campus security officer to her home to take away her keys and anything that identified her as a CSI employee.

173.    CSI treated Mr. Hobbs and the male Custodian more harshly than the female Lead

Custodian.

174.    CSI investigated the female Lead Custodian's allegations against Mr. Hobbs and against

the male Custodian, but CSI failed to promptly and thoroughly investigate the male employees'

allegations against the female Lead Custodian. Those crossclaims involved alleged violations of

some of the same policies Mr. Hobbs was accused of violating.

175.    CSI did not fire other female employees who acted in an "unprofessional" or

"unbusinesslike" manner or used "poor judgment."

176.    For example, a female employee used extreme poor judgment when she sent out, via

e-mail attachment to someone phishing, the 2015 and 2016 W-2 information for CSI employees,

including names, home addresses, Social Security Numbers, as well as earnings information. She

used poor judgment when she did not check the authenticity of the request, causing the College

unnecessary expenses and a great deal of stress for hundreds of impacted employees.

177.    In another example, pornography was accessed from a female employee's office

computer. Accessing porn on a College computer is unprofessional, unbusinesslike, shows poor

judgment, and it is against CSI's computer use policy. Nevertheless, the Director of Human

Resources simply met with her and her supervisor and issued a reprimand and warning.

178.    CSI treated Mr. Hobbs's "stalking" complaint with deliberate indifference. Mr. Hobbs

even provided GPS data as evidence. "Stalking" was an offense prohibited by Section 6.01, the

same policy CSI accused Mr. Hobbs and the male Custodian of violating. "Stalking" is also

unprofessional. CSI never even interviewed Mr. Hobbs about his complaint.

179.    On February 10, 2020, about five months after Mr. Hobbs complained about "stalking"

and about two months after CSI terminated him, CSI sent a letter to Mr. Hobbs's wife stating

that CSI was "currently conducting an investigation pursuant to an allegation regarding possible

misconduct by [the female Lead Custodian]."

180.    By that time, Mr. Hobbs was already fired, and the female Lead Custodian was already hired by another employer after deciding to leave CSI.

181.    CSI also failed to investigate Mr. Hobbs's initial report against the female Lead Custodian concerning misuse of college vehicle and waste of college resources. Misuse of college vehicle and waste of college resources was a violation of college policy.

182.    CSI also failed to investigate promptly and thoroughly the male Custodian's allegations against the female Lead Custodian.

183.    CSI treated Mr. Hobbs more harshly than the female Lead Custodian. CSI also treated the male Custodian more harshly than the female Lead Custodian.

184.    Mr. Hobbs complained repeatedly about sex discrimination. Defendants Nielson, Schwarz, and Fox were all aware of Mr. Hobbs's discrimination complaint.

185.    CSI failed to investigate Mr. Hobbs's discrimination complaint. CSI failed to follow its own policy and procedures that required prompt investigation.

186.    Mr. Hobbs complained specifically about the biased disciplinary proceedings and about the investigators and decisionmakers being biased against the male employees.

187.    CSI failed to develop and consistently implement proper policies, procedures, and practices.

188.    CSI's remedial response was inadequate. CSI treated Mr. Hobbs's discrimination complaints with deliberate indifference.

189.    CSI discriminated against Mr. Hobbs with respect to the terms, condition, or privileges of his employment based on his sex.

190.    As a result of CSI's discriminatory conduct, Mr. Hobbs has been damaged. He is entitled

to all available relief, including back pay and benefits, front pay and benefits and/or

reinstatement, pre- and post-judgment interest, compensatory damages for emotional distress,

pain and suffering, and loss of enjoyment of life, and such other, further,  general and/or

equitable relief to which Mr. Hobbs may be entitled.

191.    Mr. Hobbs is entitled to recover reasonable attorney's fees and litigation expenses,

including expert fees.

### THIRD CLAIM FOR RELIEF
### (Unlawful Sex Discrimination in Violation of Title IX of Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.*, against Defendant CSI)

192.    Mr. Hobbs realleges and incorporates by reference all preceding paragraphs as if they

were set forth again herein.

193.    CSI is a community college that receives Title IV federal student financial aid funds and

federal grant funds. CSI must comply with Title IX.

194.    Mr. Hobbs is male.

195.    Mr. Hobbs met or exceeded the qualifications for the Lead Project Coordinator position,

and he was performing his job satisfactorily.

196.    CSI subjected Mr. Hobbs to adverse employment action when it terminated him on

December 13, 2019.

197.    The decision to terminate Mr. Hobbs was based on his sex.

198.    On September 18, 2019, Mr. Hobbs was placed on forced leave after the female Lead

Custodian accused him and the male Custodian of misconduct.

199.    CSI promptly commenced an investigation of alleged "sexual assault" in violation of

Section 6.01.

200.    The entire investigation lasted only a few days. The investigators conducted the first

interview on September 23, 2019, and the last interview was held on October 2, 2019.

201.    After the investigators finished the interviews and put together the investigative report, Defendant Nielson sent Notice 2 to Mr. Hobbs.

202.    In Notice 2, CSI accused Mr. Hobbs of five different violations of the Employee Manual.

203.    Mr. Hobbs denied the policy and procedure violations he was accused of.

204.    CSI accused Mr. Hobbs of violating non-existent provisions of the Employee Manual.

205.    CSI accused Mr. Hobbs of "sexual assault" in violation of Section 6.01 of the Employee Manual, but CSI failed to define "sexual assault" and "consent" in Section 6.01.

206.    Mr. Hobbs emphatically denied the "sexual assault" allegation.

207.    CSI dismissed the need to define those terms in Section 6.01 stating that these terms were defined in Title IX.

208.    Title IX does not define "sexual assault" or "consent." U.S. Department of Education ("DOE") regulations in effect at the time did not define these terms.

209.    CSI failed to clearly define "consent" in Section 6.0, failed to apply a definition consistently between men and women and between complainants and respondents in the same Title IX grievance process, and treated male employees more harshly than female employees.

210.    CSI applied a strict "affirmative consent" requirement against the male employees, but not against the female employee.

211.    CSI also failed to state in its Employee Manual the standard of evidence to be used in investigations of alleged violations of Section 6.01.

212.    CSI's official policy and practice violated Title IX. CSI maintained a policy of deliberate indifference.

213.    Although CSI stated that it applied the "preponderance of evidence standard," Section

6.01 did not establish "preponderance of evidence" as the standard of evidence used by CSI in investigations of alleged Section 6.01 violations.

214.    In his response to Mr. Hobbs's appeal, Defendant Schwarz stated that "the Policy clearly references Title IX and it is widely known and documented that the standard for investigation is preponderance of evidence, not a higher standard."

215.    Title IX does not require institutions to use the "preponderance of evidence" standard. DOE regulations allow institutions to choose between the "preponderance of evidence standard" and the "clear and convincing evidence standard."

216.    Section 6.01 stated that at the conclusion of the investigation, Defendant Nielson will meet with the complainant and the respondent to notify them of the findings of the investigation. Defendant Nielson did not meet with Mr. Hobbs. He had a campus security officer deliver Notice 2 to Mr. Hobbs.

217.    Section 6.01 also stated that all parties will be informed of the college's appeal process, and their right to exercise a request for appeal. In Notice 2, Defendant Nielson failed to do that.

218.    CSI failed to follow its own inadequate policies and procedures.

219.    Based on the actual language of the policies and procedures, CSI was unable to show by "clear and convincing evidence," or even by "the preponderance of evidence," that Mr. Hobbs violated the specific provisions of the CSI Employee Manual CSI accused him of violating.

220.    CSI's investigation of the female Lead Custodian's allegations against Mr. Hobbs and the male Custodian was not thorough, fair, or impartial. The investigation was not equitable and was not without coercion. The investigation was biased against the male employees.

221.    The investigators and decisionmakers treated Mr. Hobbs and the male Custodian more harshly than the female Lead Custodian.

222.    CSI provided no written notice to Mr. Hobbs of the specific allegations made by the female Lead Custodian against him. Notice 1 failed to include sufficient details to allow Mr. Hobbs a meaningful opportunity to prepare for his initial interview. Notice 1 did not include the precise conduct allegedly constituting a potential violation of Section 6.01 or the date and location of the alleged incident.

223.    Notice 1 was sent out before investigators talked to the female Lead Custodian, who continued to add additional allegations against Mr. Hobbs and the male Custodian during her interviews. Mr. Hobbs did not receive written notice of the later-added allegations against him.

224.    Notice 1 was sent out on September 23, 2019 and included only a vague statement about the allegation against Mr. Hobbs.

225.    The notice focused on informing Mr. Hobbs of all the rights and privileges taken away from him prior to any investigation, and it ended with a threat of criminal charges if he did not follow any of Defendant Nielson's directives.

226.    CSI treated Mr. Hobbs and the male Custodian as if they were already found responsible.

227.    CSI did not do the same to the female employee accused of violating Section 6.01, the same policy Mr. Hobbs was accused of violating.

228.    CSI failed to provide sufficient time for Mr. Hobbs to prepare for his initial interview.

229.    Mr. Hobbs received a phone call on September 25, 2019, notifying him that he had an interview with the investigators that afternoon.

230.    Mr. Hobbs was not advised whether he had the right to have an advisor or legal counsel present during his interview.

231.    The investigators only interviewed the female Lead Custodian, one sole witness (the female Lead Custodian's wife), the male Custodian, and Mr. Hobbs. Investigators did not talk to

potential witnesses mentioned by Mr. Hobbs.

232.    CSI enforced its policies and procedures selectively and treated male and female

employees unequally throughout the entire process. For example:

   a.  CSI investigated the female Lead Custodian's allegations promptly.

   b.  CSI failed to adequately respond to Mr. Hobbs's "stalking" complaint against the

       female Lead Custodian. "Stalking" was an offense under Section 6.01, the same

       policy CSI accused Mr. Hobbs of violating. Unlike "sexual assault" and "consent,"

       "stalking" was defined in Section 6.01. CSI waited with the investigation until after it

       fired Mr. Hobbs and after the female employee was also leaving CSI. CSI treated

       Mr. Hobbs's "stalking" complaint with deliberate indifference.

   c.  CSI failed to investigate Mr. Hobbs's sex discrimination complaint.

   d.  CSI also failed to adequately respond to the male Custodian's allegations that the

       female Lead Custodian "grabbed his crotch," "slapped his ass," and opened her pants

       and said "if you want some, stick your hand in."

   e.  CSI's decision to initiate disciplinary proceedings was affected by gender.

   f.  After the female Custodian made her allegations against Mr. Hobbs and the male

       Custodian, CSI placed Mr. Hobbs and the male Custodian on forced leave.

   g.  CSI failed to put the female Custodian on forced leave after Mr. Hobbs and the male

       Custodian accused her of misconduct.

   h.  CSI "ordered" the male Custodian not to talk to Mr. Hobbs, but CSI did not direct the

       female Custodian to refrain from talking to the witness prior to her interview.

   i.  Throughout the disciplinary proceedings, the male employees were not authorized to

       be present in any of the offices of any CSI facility, which were not open to the

general public, without express written permission from Defendant Nielson. CSI did

not put the same restrictions on the female Lead Custodian accused of misconduct.

j.    Before the investigation took place, CSI sent a campus safety officer in a campus

security car to Mr. Hobbs's home to collect Mr. Hobbs' keys and anything that

identified him as a CSI employee. CSI also did that to the male Custodian. However,

CSI did not do that to the female Lead Custodian accused of misconduct.

k.    Defendant Nielson threatened Mr. Hobbs and the male Custodian with criminal

charges for violations of any of his directives. CSI did not threaten the female Lead

Custodian with criminal charges.

233.    Mr. Hobbs's evaluations consistently rated Mr. Hobbs's workplace conduct as "Exceeds

Expectations." Mr. Hobbs's personnel file contained no findings of misconduct, no warnings, no

reprimands. During the 12 years Mr. Hobbs worked for CSI, his immediate supervisors, the CSI

employees whose job was to oversee Mr. Hobbs's work and conduct, noted no violations of

policy or misconduct whatsoever.

234.    Regardless, after the female Lead Custodian made the allegations against him, and after

the biased disciplinary proceedings, Defendant Schwarz stated in his response to Mr. Hobbs's

appeal that "the varying accounts of material events and behaviors clearly indicate an extended

pattern of profoundly unprofessional conduct, behaviors, and poor judgement."

235.    Mr. Hobbs specifically complained of sex discrimination in violation of Title IX to CSI

on multiple occasions between October 2019 and January 2020, both before CSI terminated him

and while his internal appeal was pending.

236.    Mr. Hobbs communicated those complaints in writing to his immediate supervisor, to

Defendant Nielson, Defendant Schwarz, Defendant Fox, and some of the members of the CSI

Board of Trustees. CSI had actual knowledge of Mr. Hobbs's discrimination complaint.

237.    Although Mr. Hobbs complained repeatedly of inequitable treatment, CSI took no action to investigate and end the inequitable treatment.

238.    CSI treated Mr. Hobbs's discrimination complaints with deliberate indifference.

239.    CSI accused Mr. Hobbs of five separate violations of various provisions of the Employee Manual. Then, CSI "rescinded" its finding that Mr. Hobbs had violated the consensual relationship policy. Later, CSI admitted that Mr. Hobbs did not violate Section 6.03.

240.    Based on the actual language of the Employee Manual, CSI could not show that Mr. Hobbs violated the policies and procedures CSI accused Mr. Hobbs of violating.

241.    After CSI terminated Mr. Hobbs, it introduced the highly subjective "unprofessional" and "unbusinesslike" behavior as alternative reasons for Mr. Hobbs's termination.

242.    Mr. Hobbs denies being unprofessional or unbusinesslike.

243.    CSI gave inconsistent and contradictory reasons for Mr. Hobbs's termination.

244.    CSI selectively enforced existing and non-existent policies and procedures.

245.    CSI discriminated against Mr. Hobbs on the basis of his sex.

246.    CSI failed to take appropriate remedial measures to prevent sex discrimination.

247.    Several CSI administrators had notice of said discrimination and failed to adequately respond. Those failures amounted to deliberate indifference toward Mr. Hobbs's federal rights.

248.    CSI failed to enact, disseminate, and implement adequate policies and procedures to discover, prohibit, or remedy the kind of discrimination Mr. Hobbs had suffered.

249.    CSI acted with deliberate indifference in deviating significantly from the standard of care outlined by the DOE in its Title IX rules, regulations, and guidance.

250.    As a result of CSI's discriminatory conduct, Mr. Hobbs has been damaged. He is entitled

to all available relief, including back pay and benefits, front pay and benefits and/or

reinstatement, pre- and post-judgment interest, compensatory damages for emotional distress and

pain and suffering, and such other, further,  general and/or equitable relief to which Mr. Hobbs

may be entitled.

251.    Mr. Hobbs is also entitled to reasonable attorney's fees and costs, including expert fees,

incurred in bringing this action.

## FOURTH CLAIM FOR RELIEF

**(Violation of 42 U.S.C. § 1983**
**Fourteenth Amendment to the United States Constitution**
**Equal Protection**
**Against Defendant CSI, and Defendants Nielson and Schwarz**
**in their individual capacities)**

252.    Mr. Hobbs realleges and incorporates by reference all preceding paragraphs as if they

were set forth again herein.

253.    Defendant CSI is community college and political subdivision of the State of Idaho.

254.    At all times relevant, Defendants acted under the color of state law when committing the

acts complained of.

255.    The Fourteenth Amendment to the United States Constitution protects Mr. Hobbs from

being subjected to discrimination, by persons acting under color of state law, on the basis of sex.

256.    The actions of Defendants Nielson and Schwarz discriminated against Mr. Hobbs based

on his sex and deprived him of his Fourteenth Amendment right to equal protection of the law.

257.    Defendants Nielson and Schwarz subjected Mr. Hobbs to adverse employment action by

terminating his employment in December 2019 and then denying his appeal in February 2020.

258.    The decision to terminate Mr. Hobbs was based on his sex.

259.    Mr. Hobbs had a right, under the Fourteenth Amendment of the United States

Constitution, to equal protection of the laws.

260.    CSI's policies and practice failed to ensure a discrimination-free workplace.

261.    CSI failed to take appropriate remedial measures to prevent sex discrimination.

262.    CSI's policy, practice, and custom reflect a deliberate indifference toward the constitutional rights of employees.

263.    CSI failed to properly train its administrators.

264.    CSI turned a blind eye to the violation of Mr. Hobbs's constitutional rights.

265.    Defendants Nielson and Schwarz knew that Mr. Hobbs complained repeatedly of sex discrimination.

266.    Mr. Hobbs also complained repeatedly of "stalking" by the female employee.

267.    Defendants failed to adequately respond to Mr. Hobbs's "stalking" complaint. They failed to promptly and thoroughly investigate Mr. Hobbs's sex discrimination complaint. Defendants treated Mr. Hobbs's complaints with deliberate indifference.

268.    Defendants Nielson and Schwarz personally participated in the violation of Mr. Hobbs's constitutional rights.

269.    Defendants were biased against the male employees and treated Mr. Hobbs and the other male employee more harshly than the female employee.

270.    Defendant Nielson was personally involved in making the decision to terminate Mr. Hobbs. Defendant Nielson also made the final decision to not allow Mr. Hobbs to submit an appeal pursuant to Section 6.03 of the Employee Manual.

271.    Defendant Schwarz personally made the decision to deny Mr. Hobbs's appeal. His decision was final and non-appealable.

272.    Initially, CSI charged Mr. Hobbs with five alleged policy and procedure violations.

273.    Based on the actual language of the Employee Manual, Defendants could not show that

Mr. Hobbs violated the policies and procedures CSI accused him of violating.

274.    The reasons CSI gave for Mr. Hobbs's termination changed and morphed over time and

were inconsistent and contradictory.

275.    Defendants accused Mr. Hobbs of violating non-existent provisions of the Employee

Manual.

276.    First, CSI "rescinded" the Section 2.05 violation. Then, CSI admitted that Mr. Hobbs did

not violate Section 6.03, although at the conclusion of the investigation CSI accused Mr. Hobbs

of two separate violations under Section 6.03. However, while Section 6.03 did not require

Mr. Hobbs to report or take any action, CSI kept the two "failure to report and take action"

findings in its final termination notice, just tweaked the wording.

277.    CSI did not accuse the female employee with violating Section 6.03, although she was

the one who allowed the male employee to work while allegedly intoxicated, and at the time, she

failed to report it to trained supervisory personnel.

278.    Although CSI talked about its commitment to drug- and alcohol-free campus, the College

continued to employ a female supervisor who had several DUI convictions.

279.    While Section 6.03 did not require Mr. Hobbs to report his suspicions that the male

Custodian may have been occasionally impacted by prescription medication lawfully prescribed

to him by his doctor, CSI still included a failure to report and take action finding in Mr. Hobbs's

final termination notice.

280.    Although the female Lead Custodian was also aware that the male Custodian seemed to

be impacted occasionally by his prescription medication, and she interacted with him during the

specific incident when Mr. Hobbs put the male Custodian in a room "to sleep it off" (which was

before the male Custodian was officially transferred over to Mr. Hobbs's crew), CSI did not accuse the female Lead Custodian of failure to report and take action.

281.    CSI determined that Mr. Hobbs violated Section 6.01 for failing to report and take action when he witnessed a subordinate violate Section 6.01. Mr. Hobbs stated that he saw the female Custodian hug the male Custodian, the male Custodian hug the female Lead Custodian, and one time saw the female Lead Custodian "go near [the male Custodian's] groin with a hug, wrap around hug… grabbing…reaching around…hands near the groin area." Section 6.01 did not require Mr. Hobbs to report or take any specific action.

282.    Section 6.01 did not require Mr. Hobbs to report or take any other action.

283.    The female employee was a Lead Custodian, while the male employee was only a Custodian. Although CSI initially called the conduct Mr. Hobbs observed a violation of Section 6.01, CSI never placed the female Custodian on forced leave pending an investigation.

284.    CSI found Mr. Hobbs responsible for "sexual assault" in violation of Section 6.01 without defining "sexual assault" and "consent" in Section 6.01.

285.    Those definitions were necessary for a finding of "sexual assault" in violation of Section 6.01. CSI failed to adopt the necessary definitions, policies, and procedures.

286.    CSI still found Mr. Hobbs responsible for "sexual assault" in violation of Section 6.01.

287.    After Mr. Hobbs was terminated, Defendant Schwarz added consensual touching as one of the reasons for Mr. Hobbs's termination.

288.    Mr. Hobbs stated that the female Lead Custodian asked him frequently to "perform chiropractic" on her by popping her hip, and that she also asked him to massage her back and pop her back when she had a migraine (consensual touching, welcomed).

289.    The female Lead Custodian was not accused of consensual touching or inappropriate

behavior, although she was the one who asked Mr. Hobbs for the massage and to pop her back to help her migraine.

290.    CSI failed to promptly and thoroughly investigate the male employees' allegations against the female Lead Custodian. Mr. Hobbs had a crossclaim for "stalking," and the male Custodian accused the female Lead Custodian of "grabbing his crotch," "slapping his ass," and opening her pants and saying "if you want some, stick your hand in."

291.    Unlike the two male employees accused of violating Section 6.01, the female employee accused of violating the same policy, was not placed on forced leave, was not forbidden from talking to witnesses, was not banned from most parts of the campus, was not asked to return her keys and anything that identified her as a CSI employee, and was not threatened with criminal charges before CSI performed the investigation.

292.    Defendant Schwarz accused Mr. Hobbs of "unprofessional" and "unbusinesslike" behavior, but CSI failed to apply the same standards and processes to the female Lead Custodian accused of "stalking," and grabbing and slapping the male Custodian.

293.    Defendants treated Mr. Hobbs's complaints with deliberate indifference.

294.    CSI treated the male employees more harshly than the female employee.

295.    CSI had a policy and custom of failing to ensure a discrimination-free workplace and failing to take appropriate remedial measures to prevent unlawful discrimination. CSI had a custom or practice that amounted to deliberate indifference.

296.    As set forth above, Defendants unlawfully discriminated against Mr. Hobbs based on his sex. Defendants violated Mr. Hobbs's right to equal protection under the Fourteenth Amendment to the United States Constitution. Defendants acted with deliberate, reckless, or callous indifference toward Mr. Hobbs's federal rights.

297.    Defendants' conduct violated a clearly established constitutional right of equal protection of which a reasonable person should have known.

298.    Mr. Hobbs has been damaged as a result of Defendants' discriminatory conduct and their failure to promptly remedy the discrimination. He has suffered and will continue to suffer losses.

299.    Pursuant to 42 U.S.C. § 1983, he is entitled to recover all resulting damages, including lost pay and employment benefits, reinstatement and/or front pay, pain and suffering, emotional distress, loss of enjoyment of life, and other damages. Mr. Hobbs is entitled to compensatory and general damages in an amount to be proven at trial, and such other, further, general and/or equitable relief to which Mr. Hobbs may be entitled.

300.    Mr. Hobbs is entitled reasonable attorney's fees and costs.

301.    Mr. Hobbs is entitled to punitive damages as Defendants acted maliciously or with reckless disregard to his constitutionally protected rights.

## FIFTH CLAIM FOR RELIEF

**(Violation of Procedural Due Process -- 42 U.S.C. § 1983**
**Fourteenth Amendment to the United States Constitution**
**Against Defendant CSI, and Defendants Nielson, Schwarz, and Fox**
**in their individual capacities)**

302.    Mr. Hobbs realleges and incorporates by reference all the preceding paragraphs as if they were set forth again herein.

303.    Mr. Hobbs was a regular, non-probationary, full-time employee at CSI. Mr. Hobbs was not an at-will employee. Mr. Hobbs had a written employment contract. Mr. Hobbs's contract specifically provided that he could only be "discharged for just cause."

304.    Mr. Hobbs possessed a constitutionally protected property interest in his continued employment as a public employee.

305.    CSI could not terminate Mr. Hobbs's employment without constitutionally adequate due

process of law.

306.    Defendants' violated Mr. Hobbs's right to due process of law under the United States

Constitution by firing him and by denying him constitutionally adequate pre-termination and

post-termination process. CSI's biased proceeding was not procedurally adequate.

307.    Section 6.04 (DUE PROCESS PROCEDURE) of the Employee Manual

incorporated by reference I.C. § 67-5315(2) that prescribes pre-termination and

post-termination due process procedures provided to classified state employees. The

statute provides for pre-termination notice and opportunity to be heard, as well as for

extensive post-termination due process in the form of opportunity to appeal to the Idaho

Personnel Commission ("Commission"), and opportunity to appeal the Commission's

decision to the district court.

308.    Although incorporated into Section 6.04 by reference, Defendant Nielson stated in his

e-mail dated February 6, 2020, that the reference to the statute was in error.

309.    CSI specifically removed language from Section 6.04 of the Employee Manual that

previously provided an opportunity to appeal terminations internally to CSI's President. The

post-amendment policy provided no post-termination hearing or appeal whatsoever.

310.    In accordance with policy and established practice at CSI, the College provided no

meaningful post-termination hearing to Mr. Hobbs.

311.    Section 6.03 of the Employee Manual (Drug and Alcohol Free Campus and Drug and

Alcohol Testing Policy and Procedures) had an appeals provision specific to that section.

Although CSI accused Mr. Hobbs of violating Section 6.03, CSI denied that appeal opportunity

to Mr. Hobbs.

312.    CSI's policy, practice, and custom reflect a deliberate indifference toward the

constitutional due process rights of employees.

313.    Section 6.04 included an opportunity to respond to pre-termination notice, but it failed to establish a reasonable timeframe within which employees could respond.

314.    Upon notifying employees of the College's intent to terminate them, CSI had a practice and custom of not allowing employees adequate time to respond and failing to provide an explanation of the evidence.

315.    On or about October 13, 2019, CSI gave Mr. Hobbs Notice 2 and gave him five calendar days (only two business days) from the time he was served with the notice to respond in writing. CSI failed in include an explanation of the College's evidence based on which it intended to terminate Mr. Hobbs.

316.    The unrealistic deadline and the lack of any explanation of the evidence failed to provide Mr. Hobbs a meaningful opportunity to respond. Mr. Hobbs had to demand an explanation of the evidence. It took CSI until October 25, 2019, to gather the "evidence" based on which CSI sent Mr. Hobbs the notice of the College's intent to terminate him. Once again, CSI gave Mr. Hobbs an unreasonably short time to respond (only two working days). Only after CSI realized that Mr. Hobbs retained legal counsel, did CSI provide additional time for Mr. Hobbs to respond.

317.    However, the process lacked central fairness. CSI failed to provide Mr. Hobbs pre-termination or post-termination notice and opportunity to respond to charges and findings stated for the first time in Defendant's Schwarz's final decision on Mr. Hobbs's appeal. Mr. Hobbs did not have an opportunity to respond, either before or after his termination, to those alternative reasons given for his termination. CSI also failed to provide an explanation of the evidence on those charges and findings.

318.    Notice 2 included five alleged policy and procedure violations. Even the findings that

were included in Notice 2 changed and morphed over time where the initial findings to which

Mr. Hobbs had an opportunity to respond pre-termination did not match the findings in CSI's

final termination notice (Notice 3).

319.    Additionally, on the charges and findings that were included in Notice 2, there was no

pre-termination hearing in front of an impartial tribunal or decisionmaker. After CSI sent out the

letter notifying Mr. Hobbs of the College's intent to terminate him, Mr. Hobbs was only allowed

to submit his written response to Defendant Nielson, who had already shown bias against

Mr. Hobbs and the other male employee.

320.    The pre-termination notices sent by Defendant Nielson showed that for all practical

purposes the decision to terminate Mr. Hobbs had been made before an investigation took place

and before Mr. Hobbs had an opportunity to respond, rendering the opportunity to respond in

writing meaningless.

321.    In Notice 1, Defendant Nielson already concluded, before the investigation took place,

that based on the allegations made against Mr. Hobbs, "it appears to me that your acts or

omissions… is not in the best interest of the College of Southern Idaho."

322.    Defendant Nielson also instructed Mr. Hobbs to:

immediately surrender any and all identification cards, business cards, or any items
that identify you as an employee of the College of Southern Idaho along with any
and all keys which you have to any and all College of Southern Idaho automobiles,
buildings or facility of any nature.

323.    Defendant Nielson also threated Mr. Hobbs with criminal charges for any violation of

Defendant Nielson's directives.

324.    Both the pre-termination procedures and the post-termination procedures were flawed

because they were infected by bias and partiality.

325.    CSI investigators and decisionmakers showed bias against the male employees, and

allowed gender-based stereotypes, as they relate to allegations of sexual misconduct, to influence their decisions and actions.

326.    The language, tone, and manner of interviews showed bias against the male employees and gender-based stereotypes that revealed gendered assumptions.

327.    For example, investigators told the female Lead Custodian: "We need to talk about what exactly they did to you." They asked her: "Do you know of any other people who were victimized by them?" Investigators also referred to the alleged incident as "assault."

328.    The interviews revealed that the investigators assumed that the male employees were the perpetrators and the female employee was the victim. Although the female Lead Custodian was accused of "stalking," "grabbing the crotch" of the male Custodian and "slapping his ass," investigators did not label these allegations "assault" and did not ask the male employees what else the female employee "did to them," and they did not ask the male employees if anyone else was "victimized" by the female Lead Custodian.

329.    The investigators used coercive techniques, made false or misleading statements to the male employees, put words into the female complainant's mouth, called the sole witness "to help" the female complainant, did not call witnesses mentioned by Mr. Hobbs, and failed to promptly and thoroughly investigate allegations of misconduct against the female employee.

330.    While they were assigned to investigate an allegation that Mr. Hobbs violated the "sexual assault" provision of Section 6.01 of the Employee Manual, the investigators ignored the fact that "sexual assault" and "consent" were not defined in Section 6.01. They also ignored the fact that CSI failed to state the standard of evidence to be used in investigations of alleged violations of the CSI Employee Manual—"preponderance of evidence" or "clear and convincing evidence."

331.    Defendant Nielson initiated the termination process, sent Notice 1 to the male employees,

and he was also a decisionmaker. He was not impartial.

332.    Defendant Nielson was the Director of Human Resources responsible for policy and procedure development, communication, interpretation, and compliance. That included the College's Due Process policy. Defendant Nielson implemented the policy and was responsible for the continued operation of the written policy.

333.    Well-established CSI practice and custom were to not provide adequate time for employees to respond, to not provide employees with an explanation of the evidence, and to deny employees an opportunity for post-termination hearing or appeal.

334.    Through his conduct, Defendant Nielson sustained written and unwritten policies, practice, and custom of deliberate indifference toward repeated due process violations. Defendant Nielson participated personally in the violation of Mr. Hobbs's constitutionally protected due process rights. Defendant Nielson was one of the decisionmakers who decided to terminate Mr. Hobbs in violation of his constitutional due process rights. His actions and inaction resulted in the violation of Mr. Hobbs's constitutional right to due process of law.

335.    Mr. Hobbs repeatedly objected to bias in the pre-termination procedures overseen by Mr. Nielsen. The complaints were shared with Defendant Fox and Defendant Schwarz. Despite his repeated complaints, CSI failed to investigate Mr. Hobbs's complaint and failed to assign a truly disinterested and impartial party as the post-termination decisionmaker.

336.    Mr. Hobbs was not afforded a full post-termination hearing in front of an impartial tribunal. The biased post-termination proceeding was not procedurally adequate.

337.    Although CSI's Due Process policy provided for no post-termination appeal, hearing, or opportunity to be heard, after Mr. Hobbs hired legal counsel, CSI offered Mr. Hobbs an opportunity to appeal his termination in writing to Defendant Schwarz.

338.    The appeal was limited in scope. CSI did not offer a full post-termination hearing to

Mr. Hobbs. There was no opportunity to meet with Defendant Schwarz face-to-face, no

opportunity to present witnesses or cross-examine witnesses.

339.    Defendant Schwarz, the sole decisionmaker on Mr. Hobbs's post-termination appeal, was

not fair or impartial. He was not a disinterested decisionmaker. He had a predisposition regarding

the outcome of the case and a motive to uphold the College's decision to terminate Mr. Hobbs.

340.    Defendant Schwarz was applying for the president position, a promotion that would have

involved a significant raise. He had a vested interest in rubber-stamping the decision made by the

College to terminate Mr. Hobbs.

341.    As CSI's president, Defendant Fox approved, ratified, or knowingly acquiesced to

Mr. Hobbs's termination. Had Defendant Schwarz determined that CSI wrongfully terminated

Mr. Hobbs, he would have gone against a decision blessed by his immediate supervisor, and one

made with the knowledge of the Board of Trustees, during a delicate time when it behooved him

to not rock the boat and when he needed to show his loyalty to the College in the hopes of being

selected by the Board of Trustees as CSI's next president and receive a significant raise.

342.    Defendant Schwarz exhibited a clear unwillingness to decide the outcome of the appeal

based on the actual language of the policies CSI accused Mr. Hobbs of violating, the careful and

impartial review and weighing of the evidence, and the careful assessment of the credibility of

the employees involved.

343.    For example, Defendant Schwarz dismissed the significance of the fact that the CSI

Employee Manual failed to define the terms "sexual assault" and "consent." Defendant Schwarz

stated that these terms were defined in Title IX. However, Title IX does not define "sexual

assault" or "consent." Nor did DOE regulations in effect at the time define these terms.

Institutions had the responsibility to clearly define "consent" and "sexual assault" in their respective policies and to apply the definitions consistently both in terms of not varying the definition from one employee grievance process to the next and as between a complainant and respondent in the same grievance process.

344.    The definitions were necessary for CSI to determine whether Mr. Hobbs, or any employee accused of sexual assault, had violated Section 6.01.

345.    CSI chose to apply a strict "affirmative consent" definition against the male employees, but not against the female employee.

346.    Defendant Schwarz dismissed the importance of the fact that CSI failed to state the standard of evidence to be used in investigations of alleged violations of the CSI Employee Manual. Defendant Schwarz stated that "it is widely known and documented that the standard for investigations is preponderance of evidence, not a higher standard." However, back in 2017, the Secretary of the DOE rescinded the Dear Colleague letter that mandated the use of the "preponderance of evidence" standard in Title IX investigations. CSI failed to state the standard before or after the guidance.

347.    CSI charged Mr. Hobbs with "sexual assault" and found him responsible for "sexual assault" in violation of Section 6.01 of the Employee Manual. Therefore, the definition of those terms was central to evaluating the findings, and so was the standard of evidence to be used.

348.    CSI also accused Mr. Hobbs of violations not related to Title IX. CSI failed to state the standard of evidence to be used in investigations of alleged violations of the Employee Manual, whether related to Title IX or not. Defendant Schwarz was quick to excuse CSI's failure.

349.    While Defendant Schwarz dismissed the importance of the missing definitions, he went on and stated that the evidence did not establish that the female employee "affirmatively

consented to the contact," which assumed an affirmative consent definition in Section 6.01. Defendant Schwarz upheld the finding that Mr. Hobbs violated the "sexual assault" provision of Section 6.01 of the Employee Manual without definitions of "sexual assault" or "consent" in Section 6.01. He applied a definition of consent that did not exist in Section 6.01.

350.    Defendant Schwarz also stated that Mr. Hobbs's testimony did not convince him that "nothing happened." However, that was not Mr. Hobbs's burden. CSI did not put the same burden on the female Lead Custodian.

351.    Defendant Schwarz ignored the numerous inconsistencies and contradictions in the Lead Custodian's story.

352.    Instead of looking at the actual language of the Employee Manual and rendering a fair and impartial determination on whether the evidence supported CSI's findings, Defendant Schwarz was grasping at straws trying to justify Mr. Hobbs's termination.

353.    Defendant Schwarz failed to adequately address CSI's findings on two failure to report and failure to take action charges against Mr. Hobbs. Because Defendant Nielson made the decision that Mr. Hobbs was not entitled to an appeal pursuant to Section 6.03, and Defendant Schwarz failed to address those charges and findings against Mr. Hobbs, Mr. Hobbs was denied a meaningful post-termination hearing on those charges and findings against him.

354.    Defendant Schwarz stated that the lack of definitions in Section 6.01 was not "necessarily pertinent," because Mr. Hobbs's behavior violated his employment contract based on some alternative charges and findings Defendant Schwarz first stated in his post-termination appeal decision. For example, Defendant Schwarz listed consensual physical contact, inappropriate physical contact in addition to the "sexual assault" charge, and breach of contract for "unprofessional" and "unbusinesslike" behavior.

355.    These new alternative charges and findings were only disclosed to Mr. Hobbs in Defendant Schwarz's response to Mr. Hobbs's appeal. Mr. Hobbs was not notified of these charges and findings prior to his termination, and he did not have an opportunity to respond to these charges and findings either pre-termination or post-termination, as CSI made it clear that Defendant Schwarz's decision was final and non-appealable.

356.    CSI went through the mechanics of providing an opportunity to respond in writing to some, but not all, of the charges pre- and post-termination, but the biased and partial decisionmakers were not willing to listen. CSI provided the appearance of neutrality but not the reality of fairness. CSI deprived Mr. Hobbs of a meaningful opportunity to be heard.

357.    The illusory and constitutionally infirm post-termination appeal process provided to Mr. Hobbs did not constitute a true departure from CSI's established policy and practice of depriving employees of a post-termination hearing. CSI adhered to that policy and practice and exhibited deliberate indifference to Mr. Hobbs's constitutional right to due process of law. The adherence to that policy, practice, and custom resulted in the deprivation of Mr. Hobbs's federally protected rights.

358.    Importantly, Mr. Hobbs was not provided notice and an opportunity to respond to the new charges and findings first stated in the final decision on his appeal.

359.    Defendants' termination of Mr. Hobbs and their refusal to provide him with constitutionally adequate procedures violated his rights to due process of law.

360.    Defendant Nielson and Defendant Schwarz directly participated in the violation of Mr. Hobbs's due process rights.

361.    As president of CSI, Defendant Fox had final decision-making authority on terminations. He also had the final authority for policy interpretation and compliance. CSI policy required the

College to provide the employee with the basis or reason for contemplated action, and explanation of the evidence supporting the contemplated action. CSI's practice and custom was to not include all the charges and findings against the employees, to not provide adequate time for employees to respond to the charges included, to not provide employees with an explanation of the evidence, and to deny employees an opportunity for post-termination hearing or appeal. Defendant Fox had ultimate responsibility for compliance with the policy and for the continued operation of the written and unwritten policy, practice, and custom that resulted in the violation of Mr. Hobbs's constitutional due process rights. Defendant Fox allowed policy and custom under which unconstitutional practices continued.

362.    Mr. Hobbs kept Defendant Fox informed. Defendant Fox was aware of Mr. Hobbs's complaints about violations of due process.

363.    Defendant Fox approved, ratified, or knowingly acquiesced to Mr. Hobbs's termination, and to the denial of his appeal, without affording him constitutionally adequate due process of law. Defendant Fox had actual or constructive knowledge that his subordinates engaged in conduct that posed an unreasonable risk of constitutional injury to employees like Mr. Hobbs.

364.    Defendant Fox knew or reasonably should have known that these actions would cause constitutional injury. Defendant Fox failed to investigate and remedy the violation. Defendant Fox was derelict in not ensuring that Mr. Hobbs's constitutionally protected due process rights were not violated. Defendant Fox refused to prevent the violation of Mr. Hobbs's constitutional rights. Defendant Fox knowingly condoned, ratified, and refused to terminate the actions of Defendant Nielson and Defendant Schwarz, which he reasonably should have known would cause violation of Mr. Hobbs's constitutional rights.

365.    Defendant Fox failed to properly train and supervise his subordinates.

366.    At all times relevant hereto, Defendants acted under color of state law when committing the complained of actions or when failing to act.

367.    Defendants had a duty to protect the constitutional due process rights of CSI employees. This duty included Defendants' need to receive and provide adequate training on how to protect the constitutional rights of CSI employees. Defendants acted with deliberate, reckless, or callous indifference toward Mr. Hobbs's federal rights.

368.    At all times material hereto, Defendants failed to implement policies and practices that were necessary to prevent procedural due process violations from occurring.

369.    Defendants, and each of them, deprived Mr. Hobbs of his constitutionally protected property interest without providing Mr. Hobbs with constitutionally adequate due process.

370.    Mr. Hobbs's termination was not based on just cause. Mr. Hobbs was unjustly deprived of his constitutionally protected property interest without due process of law.

371.    The right to procedural due process is a clearly established constitutional right which a reasonable person, including the individually named Defendants, would or should have known.

372.    As a result of the actions and inactions of Defendants, and each of them, Mr. Hobbs has been injured and has suffered and will continue to suffer losses. Mr. Hobbs incurred damages in the form of back pay, front pay, emotional distress, loss employee benefits, loss of career track, out of pocket costs, attorney's fees and costs, all in the amounts to be proven at trial.

373.    Pursuant to 42 U.S.C. § 1983, Mr. Hobbs is entitled to all available relief, including injunctive relief and prospective relief, lost pay and benefits, reinstatement and/or front pay, emotional distress, pain and suffering, loss of enjoyment of life, , pre- and post-judgment interest, and such other, further, general and/or equitable relief to which Mr. Hobbs may be entitled.

374.    Mr. Hobbs is entitled to reasonable attorneys' fees and costs.

375.    Mr. Hobbs is also entitled to punitive damages as Defendants acted maliciously or with reckless or callous disregard to Mr. Hobbs's constitutional rights.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief.

a.    Back pay and benefits, in amounts to be determined at trial;

b.    Compensatory (emotional distress) and consequential damages;

c.    Punitive damages as allowable;

d.    Reinstatement and/or front pay and benefits in lieu of reinstatement;

e.    Injunctive and/or declaratory relief;

f.    Pre-judgment and post-judgment interest at the highest lawful rate;

g.    Attorney's fees and costs of this action, including expert witness fees, as appropriate;

h.    An offset to Plaintiff's increased tax burden; and

i.    Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this _9__ day of June, 2020.

**BLUE LAKES LAW, PLLC**

/s/ Edit Szanto
EDIT SZANTO
Attorney for Plaintiff